J. Young Jung is here for the appellants, Alyssa Yarbrough is here for the appellees, and Ms. Jung, you may begin. Good morning, Your Honors. May it please the Court, my name is J. Young Jung. I represent the appellants in this matter, Mary Foulke and Jack Young, Jr. Mrs. Foulke's decedent daughter and sister is here with us in the courtroom today along with her and Mr. Young's family members. It is an honor and privilege to represent you all here today. Your Honors, the appellants are here today because the District Court erred in granting summary judgment to the defendant, officers, and sheriff on the grounds of qualified immunity. Specifically, the Court failed to view the evidence in the light most favorable to the plaintiffs and ignored the clear presence of significant disputed material facts. Moreover, the appellants also appealed the denial of plaintiff's motion for spoliation and sanctions. I will present four specific and crucial genuine disputes of fact, mismatches if you will, critical facts in the record as to what happened during the predawn hours of December 1, 2018. The four critical genuine disputes of fact disregarded, let alone given the light most favorable to Mr. Young are as follows. Genuine dispute fact number one, whether Mr. Young ever raised the knife. Genuine dispute fact two, whether Mr. Young threw the knife. Genuine dispute fact three, whether Mr. Young was advancing. Genuine dispute fact number four, whether beanbags and tasers were ever used against Mr. Young. Is it a disputed fact that a tenant meat cleaver and a knife was thrown at the deputies? It is, Your Honor. That's disputed? Yes, sir. Okay. Was there evidence though that, I don't remember the officer's name, that the officer had a cut and his, I guess, pant uniform had been cut? Yes, Your Honor. And that's actually a very critical part and combined with the spoliation motion that we have here, that we believe that that evidence and the inconsistencies regarding the sequence, the facts, the physical evidence related there to actually really call into question the veracity of Officer Weller, indicating that that was physical evidence of Mr. Young actually throwing the cleaver at him. And I can get into that specifically if you'd like, Your Honor. The specific facts regarding that, the throwing of the knife is the only objective physical evidence that the officers have to support their self-serving statements that Mr. Young threw the knife. Curiously, Mr. Officer Weller was against the left wall of the hallway. After the knife allegedly hit his leg, he went to his patrol car by himself and then came back up to the crime scene and said, hey, look, I have a cut on my pants. And then the ECSO crime investigator was there, took pictures at the scene where he says, here's a cut on my pants, lifted his pant leg over his thigh and said, and here is a red mark on my leg. What is important about this factual scenario, Your Honor, is that hours later, he goes to the ECSO headquarters unescorted by himself, goes to headquarters, then goes into the bathroom, comes back out and says, hey, I actually had a cell phone in my pocket. And that cell phone had an OtterBox, a hard OtterBox case on it. And there is a deep, deep gash on that OtterBox. And that saved his leg now. He no longer takes the position that the red mark that was photographed at the crime scene was caused by the knife being thrown. But the district court concluded that there was an issue of material fact about that, but that it didn't matter. So even if we suppose that he didn't throw the knife, why do you say there's a dispute over whether he raised the cleaver? Sure. So that's a separate issue whether he threw the knife as to whether he raised it. Your Honor, we had expert forensic testimony that was uncontroverted by Dr. Sperry in this case that essentially stated that he could not have raised. It would have been highly improbable for him to have raised the knife given his physical ailments and conditions. Moreover, he was shot through the bicep of the right hand. Our Dr. Sperry also opined that that couldn't have happened after he threw the knife. So if you're right... Forget throwing the knife, though. I'm taking that out. I'm assuming that he did not throw the knife. Okay. Where specifically in the record does the doctor say he didn't or couldn't have raised the knife? The disputed fact in the record is in Dr. Sperry's report in the motion for summary judgment. And it is where Dr. Sperry indicates as follows. Quote, it is highly unlikely that Mr. Young sustained the gunshot wound to this right arm after he had actually thrown the cleaver. Although the position of the forearm and hand cannot be reliably determined, nonetheless, the upper arm position would not be consistent with him having thrown the meat cleaver as the follow-through motion would have carried his upper arm downwards at an angle with respect to the ground. But that's still about throwing. Right, Your Honor. But to get to that point is that he could not have held, let alone raised, let alone thrown a knife if his bicep is completely fractured. And Dr. Sperry's testimony indicates that the shooting of his bicep, it's highly unlikely that it happened after he threw it. But if the allegation is that the officers shot because they saw him with the knife raised or the cleaver raised, then how is any of that inconsistent with what the doctor said? It is inconsistent because the only individuals who say that he was raising the knife are the four officers. Right, but I see evidence that he didn't throw the knife, right? I've conceded that. I'm taking the fact that he didn't throw it. We'll establish that as a fact for the purposes of this question. But I still don't see it where in the record it says that he couldn't have raised it. It's not such that in the record that he couldn't have. It is highly unlikely that he was able to raise it because of the physical ailments. Dr. Sperry talks about the fact that he had a number of musculoskeletal ailments that would have very limited his range of motion, his ability to raise a knife. And that is undisputed. And those were ailments that he had prior to the shooting. Where can you direct me to the page number where that's discussed? If you go to Dr. Sperry's, it's in our motion for summary judgment, Your Honor, court's indulgence, and I will find it. Sure. It is at Appendix 10, tab 6713. And that is Exhibit L, Plaintiff's Expert Report by Dr. Chris Sperry. And if you go to 6719, which is also, I apologize, that is his deposition testimony. His report is at. It was an attachment to the exhibit. And it's at 6713. It's at Appendix 10, 6713. And when he was questioned about it. I won't make you lose all your time on that. If you'd like, you can submit that citation to us in a letter. What concerns me is that what I see in 6719, the question is whether Mr. Young's arm would have been raised at the time that he sustained those wounds. The answer is yes, depending on the position of the shooter. Then, with respect to Mr. Young, then his arm, if the shooter was standing then at the time when Mr. Young received both of these shots that were numbered 8-9 in the autopsy, then his upper arm would have been basically parallel to the ground. But there's no way to tell, really, the position of his forearm or hand. And then follow-up question, all right, so it's your opinion that you were not able to tell if it was before or after the meat cleaver was drawn, simply that his arm was raised. And the answer is yes, his arm was raised. That was one of the positions that he said indicated that could be there. But he also indicated that it's hard to tell, and I think defendants have conceded that. And I think those are the facts that must be given in the light most favorable to the plaintiff was that he was not raising it. That was one of the positions. The other position that Dr. Sperry talked about was the fact that his arm was down. If he was raising a knife, that the position, the forearm could have blocked the shots. There would have been a different type of position. And, again, raising it parallel to the floor, at the time that he called, he could have walked out that way. We don't know exactly, Your Honor, but the fact is that it was not in a position to have been a threat to the officers. And that is the objective reasonableness factual scenario that the court was required to take. Is the 9-11 call in the record? Yes, Your Honor, it is. And it does reflect that he called and said he murdered someone with the meat cleaver, right? He did. But the requirement, Your Honor, is that a 10-minute phone call by someone that all the officers recognized was suicidal and had a mental health. The commanding officer said 10 different times at the FDLE interview he knew it was a mental health call. He understood it to be a mental health call. He did not believe he murdered. But even if 10 minutes before a call saying I murdered someone, the officers still have an obligation to not go in guns blazing. The officers still have an obligation to assess the situation when they get there to ensure, because imminent fear of deadly force or serious bodily injury doesn't attach for the 10, 15 minutes that it took them to get there.  And that assessment has to be done at the time that they unleashed at least 27 bullets into Mr. Young's body. When they get up here, they're going to tell me that there was a command to drop the meat cleaver and the knife. He failed to do it, and they tried to use a nonlethal bean bag first, and that didn't work either. Are either of those facts disputed in the record? Those facts are disputed? So the number four is that there is no, as our police practices expert indicated, there is no way that within five to six feet, which is where these officers were, three to five high-powered bean bags at the velocity that they were issued against his body wouldn't have caused a significant damage. Mr. Frank Fernandez said that there was no evidence in the record from the defendants that those hit his body. They just simply say no effect. They simply say we issued tasers. There's no record that those tasers hit. They simply say no effect. These are all self-serving statements by the officers as to why they were justified. And, Your Honor, I just want to go back briefly that on page 19 of the motion for – But may I ask you a question, though? It's my understanding, and maybe I'm incorrect, but normally when there's either a shooting or a tasering, aren't those weapons taken into possession by the investigating officers? Yes, Your Honor. Okay. Were the tasers taken? Yes, they were. Were they tested? They were – they had – tasers were discharged. Whether that was before or after the shooting, Your Honor, that is unclear. There were beanbags collected from the scene. Whether they were discharged before or after or at Mr. Young is unclear. And, again, these are the facts that need to inure in the favor of the plaintiffs because there are some serious questions about what happened at the time before, during, and after. Those are important factors that this court has said in Kaczynski. What happens with the knife before, during, and after the shooting are critical and crucial elements of the consideration of the court below. And that's what she did not do. And just before I sit, Your Honor, Your Honor asked where in the record the references to the chronic and multiple physical ailments was referenced. It's on page 19 in Exhibit L, page 2 to 3 of the motion for summary judgment. And that is where Dr. Sperry also talks about the physical ailments in addition to the gunshot wounds as to how those would have been instantaneously incapacitating of Mr. Young. Whether those were shot before he raised or could raise, those are factual disputes that should inure in the favor of the plaintiffs. This is obviously a tragic situation any way you cut it. The problem that I face is that it's, as I read the record, and let me know if there's anything else we haven't talked about that I'm missing, it is within the realm of possibility that something else happened, but I don't see evidence that something else happened, as opposed to the police officers have a number of pieces of evidence on their side, including testimony, the beanbags, the discharge tasers. And you could imagine a scenario where things might have happened differently, but obviously we don't have the decedent's opposing testimony. And so what I struggle with is the mere possibility that something else happened isn't enough to create a genuine issue of material fact. You need actually evidence on both sides of the question. What's your response to that? My response to that, Your Honor, is that the story that the officers say that he raised the knife is their own statements, and they are consistent with that, as they would need to be. That is the only evidence that Mr. Young created an imminent force situation. Didn't some of the directional testimony about the bullets establish that his arm could have been up when he was hit? I think that there's disputed facts that his arm couldn't have been hit, that if he was hit, that that would have required him to drop the knife immediately. The shot to the neck and the spine, the shot to the brain, the shot through his arm, all of those are three independent forensic physical bases for how Mr. Young could not have raised, thrown, raised or thrown or held a knife. The sequence of those events, Your Honor, is what is in dispute. The fact that the officers say the sequence is that he raised it and then we shot, but there are three other independent reasons why, physical forensic reasons, in addition to his physical ailments, as to why Mr. Young wasn't in the physical position, capability to raise the knife in a way that would have been threatening to justify the officers. I think this foliation evidence, or at least the evidence regarding him being hit, I understand. I think it goes to credibility. It goes to, are there facts that don't seem consistent with what the officers are claiming? And I think that's the importance of that evidence, Your Honor, because that's the only physical evidence that would support their claim that not only did he raise it, but then he actually threw it. And so I think that calls into question serious credibility issues and the incredible story and the sequence of how it went down as to what happened. If you look at the gash on the auto box, Mr. Young, a 65-year-old, frail, physically incapacitated individual would have had to throw a knife at a velocity to make a gash in an auto box when he was five feet away and never got shot. He was able to throw it. It just seems that those are the types of facts that jury trials are made of, and the court ignored those facts and disregarded them altogether. Thank you. All right. Thank you, Ms. Jung. And we'll hear from Ms. Yarbrough. Good morning. May I please report? My name is Melissa Yarbrough, and with me today is Jennifer Hawkins, and together we represent the defendants in this matter, the deputies, and the sheriff. The defendants request this court affirm the defendant's motion for summary judgment, the district court's ruling on the motion for summary judgment, and the district court's ruling on the plaintiff's motion in limine regarding the weighting of evidence. From the time the deputies arrived at John Young's apartment until the ceasefire was approximately three minutes, and in those three minutes, the deputies attended multiple tactics involving less than lethal force, and it wasn't until they were left with no other choice that lethal force was used to protect themselves and others. The shots fired at deputies Holloway, Weller, McCracken, and Lavoie lasted less than three seconds of that interaction with Mr. Young. Officers are faced with split-second decisions every day. Those split-second decisions alter lives, and this case is an example of that. On December 1st, 2018, Mr. Young called 911 at approximately 349 a.m. In that call, he informed dispatch that he had just murdered a man with a meat cleaver, and that that man was still inside his apartment. The deputies were dispatched, and they arrived at Mr. Young's apartment complex at approximately 355 a.m. When they arrived, or while they were en route, rather, they were informed by dispatch that Mr. Young admitted to killing a man, that he admitted to still possessing the meat cleaver, and dispatch informed the deputies that they instructed him to put it down, and he told her no, because he intended to kill the deputies when they arrived. Your counsel on the other side has indicated that police knew that it was a mental health call. Can it be a mental health call and a call that a crime has been committed, or do you think, is it your understanding that the deputies knew that the alleged murder had not occurred when they received that call? It's not where the other ear are. They had a duty to investigate whether or not there was either a dead body or a severely injured person based on the admissions of Mr. Young to the 911 operator. So, whether they were aware that there may have been some mental health issues going on with Mr. Young when he called 911, and I think that goes to support the actions that they did take, and part of the record evidence is that Deputy Holloway, when they arrived on scene, before they approached the door, had attempted to call Mr. Young back, and Mr. Young did not answer the phone, because the record evidence shows when Mr. Young noticed that the deputies had arrived at the apartment complex, he abruptly discontinued the call with the 911 operator, but that was not before he told the 911 operator that he also possessed a gun, which was relayed to the deputies. And so, they had a duty at that point to approach Mr. Young, but also to investigate whether or not there was an injured person inside his residence. And Mr. Young, in his own words, was very specific about what the person looked like, where he was located inside the residence, and the weapon that was used when he committed this crime, alleged crime at the time. Of course, when we apply these Graham versus Connor factors to determine whether the use of deadly force was reasonable under the circumstances, and of course it has to be proportionate to the force, one of the more important factors is the severity of the crime. And why isn't there a genuine issue of fact about whether or not they reasonably believed that there was a crime, or whether this is another mental health crisis? They knew that he had mental health problems, and so why couldn't a jury make a determination that this was more of a mental health crisis, rather than this man committed a murder? Your Honor, I don't think there's any record evidence that the deputies knew it was a mental health crisis call. The record evidence is that they suspected a mental health issue, along with the report of a murder. But the deputies, in their discretionary duties, have to take that investigation of a potential murder just as seriously, if not more seriously, than the mental health issues that may be present in the person who's calling 911. Well, that's an argument you can make to the jury, right? But it doesn't create a genuine issue of material fact. The fact was, Mr. Young still answered the door with a meat cleaver and a box cutter in his hand, and refused to put it down. What's your response to the point that if the beanbags had hit him, had hit Mr. Young, that they would have caused severe damage, so there's no reflection that those beanbags actually hit him? The record evidence establishes that the beanbags were discharged, and there's photographic evidence that's present in this case. Right, but the officers, they testified that the beanbags were discharged and that they hit Mr. Young, correct? Yes, Your Honor, it had no effect. And normally, when beanbags discharge, they're going to leave a mark. So how do you then address that? That would turn on expert testimony regarding the distance away that Weller was from, which the record evidence establishes that they were approximately five to six feet away, and maybe that distance... Do you have expert testimony that said five to six feet away would not leave bruising or swelling or welting? I believe from the expert testimony that, if I recall correctly, that anything was possible based on the clothing that he was wearing, and he was clothed, based on the actual physical contact that was made, whether they brushed him or hit him directly. But what we also know is from deposition testimony and testimony from Deputy Weller, that when the beanbags made contact with Mr. Young, Mr. Young walked in on Deputy Weller. I'm sorry, he did what? He walked in, he looked, and made contact with Deputy Weller. Well, I understand that, but how is that not an issue of fact for a jury to determine whether or not it's credible that the beanbags were discharged when there isn't evidence on Mr. Young's person? Because there's no clearly established law that they had to use anything less than lethal force when they were met within five to six feet away of a man who was wielding, which is undisputed. No, I understand what the clearly established. I'm just trying to determine whether or not there's a genuine issue of material fact and whether or not, in fact, it is a material issue that doesn't necessarily coincide. I mean, maybe tasering someone isn't going to leave a mark, but a beanbag, I mean, they have a lot of force. It's no different than discharging a blank bullet. I would respectfully disagree in that aspect, but it doesn't create a genuine issue of material fact, because it doesn't matter in the analysis of the case on whether or not the officers were within their rights to use deadly force. It doesn't matter if the beanbag round was ever fired at Mr. Young. What about the argument that if they say that the beanbags, that they did use beanbags, whether or not they had to, but you could conclude from the evidence that they did not, that that puts the credibility of the rest of their story into a different light, that perhaps their statements that he had raised the knife were untrue. What would you say to that line of argument? In this particular situation, I would submit that there is no evidence that they did not discharge the beanbags. The evidence is that the beanbag rounds were discharged. Although I think the evidence, though, on the other side is that had the beanbags been discharged and hit him, he would have suffered a physical injury. Do you have expert testimony? I know Mr. Young's state has evidence that he would have suffered some physical consequences. Did you have an expert on the other side that said not necessarily? If I recall correctly, the expert testimony from plaintiff also wavered on that, just as it wavered on whether or not his arm was raised. Whereas in that testimony, that expert said it was possible his arm was raised and it was the position of the hand can't be reliable. So let me ask you a question sort of going on what Judge Grant asked. So let's assume that Mr. Young hadn't raised the meat cleaver, hadn't thrown the knife, had not advanced, and that the beanbags and tasers were not used. Was lethal force justified? Yes, Your Honor. So talk to me as to why. Lethal force was justified for multiple reasons, but most recently this court has held in 2021 and 2023 that it is reasonable and therefore constitutionally permissible for an officer to use deadly force when he has probable cause to believe that his life is in peril. What case is that? You're citing to a case without telling us what it is. Sorry. Tillis v. Brown. It's 12th Federal Court, 1291, 11th Circuit, 2021. And then also Harris-Billick v. Anderson, 6104, 1298, 11th Circuit, 2023. And it's reasonable because of Pinley v. Esslinger, 605 Federal 3rd, 843, Cronkite Circuit in 2010, because the analysis of the balancing test is governed by the severity of the crime at issue. In this situation, we knew, the deputies knew going in that Mr. Young had reported that there was a murder and that there was a body inside his apartment in the bedroom. Two, whether Young posed an immediate threat to the deputies or others, this was an apartment complex, this was his own home, and Mr. Young possessed, undisputedly possessed, a meat cleaver, which was the supposed murder weapon, and a box cutter when he exited the residence toward the deputies. And three, whether Young actively resisted the arrest. Mr. Young refused to drop the weapons that were in his possession. He never had to raise it. He never had to throw it. And this court found in Shaw v. City of Selma, give me a minute, I'll find you that case site, 834 Federal 3rd, 1093, that whether in that situation, Mr. Shaw possessed a hatchet. And this court determined that whether he threw the hatchet at the officers or raised it to throw it was immaterial to whether or not the use of force was reasonable under the circumstances. Is it disputed, would you say, that he was advancing, that he exited the apartment toward the officers when they arrived? It is not disputed that he exited the apartment. When there are photographic evidence in this case where Mr. Young's body came to its final resting place, which was feet outside of the door, not inside the door, not with the door closed, there is no evidence whatsoever that he was fleeing from the officers at any time. So you cited Tillis v. Brown. And this is one of the issues with these kinds of cases is that these are very fact specific. But in Tillis, you have an individual who is going on a high speed chase and he is being pursued by law enforcement. And when he exits the vehicle, then there is a discharge by a police officer. But I mean, that is after a very, very long police chase of where the individual is evading the police. I mean, that is not what happened here. It is not what happened here. I mean, these things have to be applied to the facts of the individual cases. And here again, I asked you, which is, if you take the evidence in the light most favorable to Mr. Young, which is that he didn't raise the meat cleaver, that he didn't throw it, that he didn't advance, and that bean bags and tasers were not used, and all you had was him at the door holding a meat cleaver and a box cutter, why was lethal force justified? Because simply possessing the meat cleavers, the meat cleaver and the box cutter was enough. Opening the door, answering it with the meat cleaver and box cutter, with the knowledge that the deputies had that he had just reported murdering someone with the meat cleaver, is enough to put the deputies in harm's way when they are less than six feet from him. Plaintiff's counsel argued that the court failed to utilize the most favorable to the plaintiff, but on ECF 78 in the court, the district court's order on the motion for summary judgment, footnote 2, the court specifically notes that it was taken in the light most favorable to the plaintiff, but also when Fourth Amendment excessive force claims are analyzed, they're analyzed under the objective reasonable standard. So while the facts are analyzed in the light most favorable to the plaintiff, they are analyzed from the viewpoint of a reasonable officer on scene with the exact same set of facts and circumstances that faced the officers in this instance on December 1st 2018. And that is why I would turn the court's attention to Shaw versus City of Selma, because those facts are substantially similar. And in those facts, Mr. Shaw was walking away from the officers. When the officers continued to approach him and when he turned with the hatchet in his hand, whether to raise it or not, because of the distance between him and the officers, it was reasonable for those officers to fire when someone is killed. But it doesn't mean the use of lethal force was unreasonable. And so for those reasons, we would ask that the court affirm the district court's ruling on the motion for summary judgment and affirm the district court's ruling on offense of humiliation. Thank you, Ms. Yarbrough. Ms. Jung, you've reserved some time for rebuttal. If I could start with Shaw. You're going to have to speak into the microphone because we're recording your comments. Yes, Your Honor. My apologies. I would like to start off with where my opposing counsel left off, which is Shaw. And actually the critical difference in Shaw is that the court stated the decisive one here is the threat of physical harm that Shaw posed at the time he was shot. The issue is whether an officer in Williams' position reasonably could have believed that Shaw posed a serious threat when he was close to and advancing on Williams. That was crucial to the reasonableness of this determination. And that is that the use of a lethal weapon is not enough to warrant the exercise of deadly force and shield an officer from suit. Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination. But also in Shaw, there was a video. Yes, Your Honor. Which we don't have here. And the video showed that when the shot was fired, Shaw was close to Williams and moving closer. So they're very different because here they're actually, in Shaw there was evidence, video evidence that the court could look at to, in essence, know that in fact there was an advancement made by Mr. Shaw, which caused into question the officer to discharge his weapon. Yes, Your Honor. Correctly under the law. But here we don't have video. That's a critical point here. Almost all the other cases in this circuit regarding the objective reasonableness standard have witnesses, videos, a surviving person who was shot. We have no data here. Why is there an issue of material fact on whether Mr. Young was advancing? Because I think that that is one of the stories that the defense would have justified in the use of deadly force. You have Officer Holloway who stated he stayed standing even after he allegedly was shot after several high-powered beanbags. Officer Weller states he was frozen and not like charging at them. He just stays there. McCracken says Mr. Young was stationary. Yes, he was standing. Lieutenant Barnes, who is the highest commanding officer at the scene that night, he was not one of the shooting officers, but he was the highest commanding. He has inconsistent testimony by the FDLE where he says he was advancing. This is contrary to the other four shooting officers. What about the fact that his feet were outside of the door when his body was located? Thank you for asking that, Your Honor. I think the facts are clear that there were, he came out the door because the officers told him to. He at first did not want to come out. So as you can see from the record, there are conflicting testimony as to what was, he was shouted several instructions, but included in that was that he was directed to come out of his unit. And that is an officer who testified to that, that he was told to come out of the unit, and that's where he was standing when he was shot. But he was told to come out of the unit, and so you're saying he complied with that instruction, but he was also told to drop the meat cleaver and the knife, and he did not comply with that instruction, right? According to the officers. According to the officers, Your Honor. And again, the distinct issue here is that the only person who could provide any contrary statement to the defendants is that he was shot by them. So there is nothing else we can do except look at the physical and forensic evidence. The fact that it should be looked at is not most favorable to the plaintiff, because he sustained several shots. Of course, I'll be honest, Your Honor, the officers have to say what they said, and they're all very consistent in saying that, but there's nobody else here. But when you have physical forensic evidence that says there are multiple reasons why he could not have eaten. Is there physical evidence or other photographs that show that he had welts or bruising on his body from beanbags? There was no indication in the record, Your Honor, and in fact, the medical examiner for the county made a grave error. Maybe intentional, maybe not. He did not even note that Mr. Young's right arm, the humerus bone, was completely shot through, and he conceded in his deposition testimony, yeah, I guess if it was broken, it would have been hard for him to have thrown or even held a knife. The sequence of when Mr. Young had raised, thrown, that is what is in dispute, and we have enough evidence, a lot of fishy evidence, quite frankly, Your Honor, that calls into credibility the officers' statements, because they're inconsistent with the facts. And they may not go directly to whether he raised the knife or not, but they go to what was the motivation of these officers to do what they did, to make certain inconsistent statements, to create and fabricate, quite frankly, objective physical evidence that he was hit by a knife, took that evidence home, 27 months later turns it into the evidence. I'm with you perhaps up until the point of fabricate evidence. I've not seen any evidence that the officers explicitly have fabricated evidence. Is that really what you're wanting to suggest? Your Honor, it is the plaintiff's position that the stories are just plainly inconsistent. But you're not saying that they fabricated physical evidence, are you? Your Honor, I think the slice on the pants is not consistent. I mean, your best argument really is spoilation of evidence, and if you went to trial, you could impeach the officers if they want to bring out the, and you can obviously do chain of custody and call that into question, correct? Yes, Your Honor. That's probably a better argument than fabrication of evidence. Yes, I understand, Your Honor. Yes, and I think, in closing, I think this Court has made also very clear in Tosha versus the United States, that when the only individual to counter the competing versions of the truth, and one version cannot be told because he is dead, the Court has an even more exacting requirement to look fairly critical at the assessment of the forensic evidence, the original reports and statements of the experts and the officers' testimony. We have no video evidence. We have nothing to support what the officers say, and I think that that's very important in this particular case, given the facts and that they were not given the light that was favorable to the plaintiff. I have one more question. Was counsel correct that the expert was equivocal about whether the beanbags would have created marks on the decedent? Thank you for the opportunity to clarify that. In fact, all my notes are getting jumbled at this point, but Mr. Frank Fernandez, who is a police practices expert, who was not moved to be excluded by Daubert in any way, shape, or form, stated very unequivocally, quote, and this is at Fernandez's report, appendix 10, tab 67-4, his report states, given Mr. Young's, first of all, the recommended safe distance for discharge of a beanbag is 20 feet. They admit that they were 5 feet. Given Mr. Young's weight, stature, age, and physical condition, deploying multiple beanbags within such a close distance would have, with a high degree of certainty, with a high degree of certainty, produced significant damage to his body. And there was no such information or factual record to support that, Your Honor. And last question. Are there any photographs of the aftermath that show where the knife and the meat cleaver were laying? I do not need to see. I can look at the record later. I don't need to see it now, but I'm wondering if there are. I wanted to confirm that there are photos. And curiously, the knife is way behind where the officers were. You'll see it when you look at the photographs. The hallway is very, very narrow. These are four very large men who all testified they were stacked very close together. Officer Weller was to the far left wall, which is also the leg that allegedly was hit by the knife. And then the knife then goes all the way back. You also have testimony. Mr. Weller is the only one to witness that he was hit by the knife. Nobody else. Everybody else says, we didn't see it. And the knife ends up behind them, as well as the taser, behind them in the hallway where the rest of the four officers were located. Thank you. Thank you, Your Honor. All right. Thank you, counsel. Court is in recess until 9 o'clock tomorrow morning. All rise.